

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 24S-PL-184

## EdgeRock Development, LLC, ZPS Westfield, LLC, and First Bank Richmond,
*Appellants/Defendants,*



**FILED**

Jun 03 2025, 2:16 pm

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

—v—

## C.H. Garmong & Son, Inc., Signworks, Inc., and Fox Contractors Corp.,
*Appellees/Plaintiffs.*

Argued: September 5, 2024 | Decided: June 3, 2025

Appeal from the Hamilton Superior Court 5
No. 29D05-1912-PL-11500
The Honorable David K. Najjar, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 22A-PL-1968

**Opinion by Justice Molter**

Chief Justice Rush and Justices Massa, Slaughter, and Goff concur.

**Molter, Justice.**

EdgeRock Development, LLC transformed five undeveloped lots into the Trails of Westfield—a planned unit development in Westfield, Indiana, comprising retail and residential projects. It still owns two of the lots; it sold two lots to ZPS Westfield, LLC; and it sold one lot to a nonparty. EdgeRock contracted with C.H. Garmong & Son, Inc. and Fox Contractors Corp. to develop all five lots.

When EdgeRock first fell behind in its payments to Garmong, Garmong recorded construction liens that EdgeRock satisfied by obtaining a loan from First Bank Richmond, which the bank secured with a mortgage on EdgeRock's lots. Then, when EdgeRock fell behind again, Garmong and Fox each recorded construction liens on all five lots in the development. And the liens were redundant: Each lien stated a cumulative debt covering the contractor's work on all five lots, not just a debt for the work benefiting the owner of the lot to which the lien attached. That meant the contractors were using multiple properties with different owners to secure the same debt.

Recording the liens didn't prompt payment that time. So the contractors sued EdgeRock for money damages on breach of contract claims and sued the other property owners, including ZPS, to foreclose the construction liens that secured the outstanding debts. Following a bench trial, the trial court awarded the contractors most of the relief they sought. But the Court of Appeals concluded the construction liens were overstated because they were not limited to the debts for the improvements directly benefiting the properties to which the liens attached. And it reversed the portion of the judgment foreclosing the construction liens.

We granted transfer to answer questions of first impression related to: (1) the validity and scope of the contractors' construction liens, and (2) the priority between the construction liens and First Bank's mortgage lien on EdgeRock's property. In short, we conclude that a construction lien secures only the debt for improvements directly benefiting the property to which the lien attaches. So the contractors can foreclose the liens on each

property to recover only those amounts, not amounts for work to improve a different owner's property.

We also conclude that First Bank's mortgage lien is senior to the construction liens for the amount the bank loaned to satisfy Garmong's prior construction lien. But the mortgage lien is junior for the remaining amounts, including the amount the bank loaned EdgeRock to pay off a prior mortgage held by the project's investors.

# Facts and Procedural History

## I. Trails of Westfield Development

EdgeRock undertook to commercially develop seventeen acres of property on the southeast corner of State Road 32 and Oak Ridge Road in Westfield, Indiana. The property began as one parcel, and then EdgeRock subdivided it into five lots, which the parties refer to as Lots 1 through 5. The project was to build a mixed use, planned unit development known as the Trails of Westfield, with Lot 4 zoned for multi-family apartments and the rest zoned for retail businesses. This is how the property appeared before it was developed:



At that point, the land had no water or sanitary service, it had homes on it that had to be demolished, and there was limited road access and quality. The Anna Kendall Drain and stream ran through where 175th Street was going to be built, and all five lots were in floodplains or floodways. Thus, significant infrastructure and earthmoving work, including moving the Anna Kendall Drain and stream, was required before the property could be put to commercial use.

EdgeRock treated construction on all lots as one project with a single, overarching infrastructure plan executed through a web of contracts.

**EdgeRock-Garmong Contract (All Lots).** EdgeRock hired C.H. Garmong & Son, Inc. to construct common infrastructure (including grading, sewer, and water) on all the lots and to construct buildings on Lots 1 and 2. Fox Contractors Corp. was Garmong's infrastructure subcontractor for the EdgeRock-Garmong contract, enlisted to perform earthwork and infrastructure installation. That entailed work on all five lots, including utility work, earthwork on Lot 3 to raise its elevation, and building a retention pond on Lot 5 to collect runoff from the area.

**ZPS-EdgeRock Contract (Lots 1 and 2).** ZPS Westfield, LLC bought undeveloped Lots 1 and 2 from EdgeRock, and the parties entered a development agreement requiring EdgeRock to construct retail buildings and common infrastructure on those lots (which EdgeRock fulfilled through a portion of its EdgeRock-Garmong contract). ZPS's contract with EdgeRock required work only on Lots 1 and 2, and ZPS agreed to pay EdgeRock a total of $1,720,000, which ZPS did. After EdgeRock developed Lot 1, ZPS leased it to Starbucks, and after EdgeRock developed Lot 2, ZPS leased one portion to a Penn Station sandwich shop and another portion to Forum Credit Union.

**EdgeRock-Dahm Contract (Lot 3).** EdgeRock sold Lot 3 to a nonparty, Dahm No. 49, LLC, which Dahm developed into a Crew Carwash.

**Lots 4 and 5.** EdgeRock still owns Lots 4 and 5, which it intended to develop into apartments and mixed-use retail shops, although it has not yet done so.

**EdgeRock-Fox Contract.** EdgeRock also had a separate, direct contract with Fox to move the Anna Kendall Drain, to construct 175th Street between Lots 1–3 and Lots 4–5, and to install related infrastructure. Fox's work on the 175th Street Project stretched from the southern portion of Lot 2 east, benefiting all lots adjoining 175th Street. The 175th Street Project was to be funded by Road Impact Fee Credits ("RIF Funds") issued by the City of Westfield.

This is what the area looked like after development through these contracts:



## II.  First Bank Richmond Loan

As the project was progressing, EdgeRock stopped paying Garmong's invoices, leading Garmong to record a construction lien for $2,140,722.51. At that point, Oak Ridge Investments, LLC owned Lots 4 and 5, and EdgeRock was one of the company's members, with Birch Dalton serving as both companies' manager. Oak Ridge's investors held promissory notes for the lots' purchase price, which the investors secured through a mortgage on the property.

EdgeRock satisfied Garmong's lien by borrowing $4.9 million from First Bank Richmond and using some of those funds to pay all of Garmong's overdue invoices. But EdgeRock used most of the loan proceeds for its own general use or to pay the project's investors, and it

did not put any of the rest of the loan into the project. It used $2,028,443.62—most of the remaining loan proceeds—to pay Oak Ridge investors for satisfaction of their mortgage on Lots 4 and 5, with First Bank then recording its own mortgage on those lots to secure its loan (along with other security, including a security interest in the RIF Funds).

## III. Garmong's and Fox's Subsequent Construction Liens

After EdgeRock satisfied Garmong's first lien, more payment disputes arose between EdgeRock, Garmong, and Fox related to work under the EdgeRock-Garmong Contract, leading Garmong to record two liens—one on EdgeRock's lots, the other on ZPS's lots—both for the same amount ($1,009,055.62) covering the same work. Fox recorded three liens related to its subcontract work for Garmong—one each on lots owned by EdgeRock, Dahm, and ZPS—all for the same amount ($500,053.42) for the same work. Later, Garmong issued a partial payment to Fox, and Garmong and Fox stipulated that this $500,053.42 debt was reduced to $202,623.56.

Fox also recorded three construction liens (one each on properties owned by EdgeRock, Dahm, and ZPS), all in the same amount ($1,213,228.23) for the same work on the 175th Street Project under the EdgeRock-Fox contract. Fox later released its liens on Dahm's property, leaving the liens on EdgeRock's and ZPS's property remaining.

## IV. Litigation

Garmong, and then Fox in quick succession, sued for damages and to foreclose the liens. First, Garmong filed a Complaint for Foreclosure of Mechanic's Liens, Breach of Contract, Unjust Enrichment and Damages against EdgeRock, ZPS, First Bank, Fox, and Signworks (another subcontractor). Then EdgeRock, Fox, and ZPS counterclaimed. Fox also filed cross-claims against EdgeRock and ZPS, as well as a third-party complaint against Dahm. Fox's claims against EdgeRock, ZPS, and Dahm sought money damages under several theories and to foreclose its construction liens (although it later dismissed its claims against Dahm).

EdgeRock, ZPS, Garmong, and Fox all filed summary judgment motions, which the trial court ruled on mid-trial. Also during the trial, the City of Westfield interpleaded its RIF Funds totaling $938,322.40, in which multiple parties claim an interest. Following an eight-day bench trial (spread over several months), the court issued its Findings of Fact, Conclusions of Law, and Judgment, which it later partially modified in an order on motions to correct errors. Relevant to this appeal, the court's rulings were that Garmong prevailed on its breach of contract claim against EdgeRock for $943,042.64 (plus interest and costs); Garmong could foreclose its construction liens against EdgeRock's lots for the same amount (plus attorney fees); Garmong could foreclose its construction liens against ZPS's lots for the same amount (plus interest and costs); Fox prevailed on its cross-claim for breach of contract against EdgeRock in the amount of $1,301,531.37 (plus costs); Fox could foreclose its construction liens on EdgeRock's lots for $202,623.56 under the Garmong subcontract and $1,166,728.23 under the EdgeRock-Fox contract (plus costs and attorney fees); Fox could foreclose its construction liens on ZPS's lots for the same amounts (plus costs); the construction liens were senior to First Bank's mortgage lien except for the loan funds used to satisfy Garmong's previous lien; and EdgeRock was entitled to the RIF Funds.

EdgeRock, ZPS, and First Bank appealed, and Fox cross-appealed.[1] The Court of Appeals affirmed in part, reversed in part, and remanded with instructions. The court held that by asserting duplicate liens on properties with different owners and without segregating the debts by the improvements attributable to each owner's lots, Garmong and Fox overstated their liens, rendering them invalid. *EdgeRock Dev., LLC v. C.H. Garmong & Son, Inc.*, 227 N.E.3d 907 (Ind. Ct. App. 2024). And because those construction liens were invalid, there was no longer a priority dispute with the bank's mortgage lien. *Id.* at 931. The Court of Appeals also held that the trial court erred by awarding the RIF Funds to EdgeRock, instructing the trial court on remand to instead hold those

---

[1] On appeal, Signworks and ZPS settled their claims with each other.

funds pending parallel litigation in the Hamilton County Commercial Court, which will determine which party is entitled to the funds. *Id.* at 936. The court noted that its holdings regarding the lien foreclosures and RIF Funds do not disturb the trial court's monetary, in personam judgments against EdgeRock on Garmong's and Fox's breach-of-contract claims. *Id.* at 938–39.

Garmong and Fox then sought transfer, which we granted, 235 N.E.3d 135 (Ind. 2024), thus vacating the opinion of the Court of Appeals, Ind. Appellate Rule 58(A).[2]

# Standard of Review

The parties appeal the trial court's summary judgment rulings, its final judgment with findings of fact and conclusions of law, and its rulings on motions to correct error. We review the trial court's summary judgment rulings de novo. *Gierek v. Anonymous 1*, 250 N.E.3d 378, 384 (Ind. 2025). We apply a two-tiered standard of review to the findings of fact and conclusions of law—"first determining whether the evidence supports the findings and, if so, whether the findings support the judgment." *Town of Linden v. Birge*, 204 N.E.3d 229, 233 (Ind. 2023). We apply a clearly erroneous standard to the trial court's findings of fact and a de novo standard to the trial court's conclusions of law. *Id.* at 234. And we review rulings on motions to correct errors for an abuse of discretion. *Expert Pool Builders, LLC v. Vangundy*, 224 N.E.3d 309, 312 (Ind. 2024).

---

[2] The Indiana Bankers Association filed an amicus brief in support of First Bank. Indiana Constructors, Inc., the Indiana Builders Association, and Associated General Contractors of Indiana, Inc. filed an amicus brief in support of Garmong and Fox. The number of briefs in this case is extraordinary; the associated record is voluminous; and we granted the parties' joint motion for an extended oral argument due to the number and complexity of the issues on appeal. We commend all parties and amici for ensuring the quality of their arguments and submissions matched the quantity.

# Discussion and Decision

When a contractor supplies labor or materials to improve real property, Indiana provides a statutory remedy to secure the resulting debt—a lien on the improved property, which when enforced may compel the property's sale to pay the debt. Ind. Code § 32-28-3-1 *et seq.*; *Mann v. Schnarr*, 95 N.E.2d 138, 141 (Ind. 1950). These liens—commonly referred to as "mechanic's liens" or "construction liens"—augment rather than replace claims like breach of contract, unjust enrichment, quantum meruit, and account stated. They are "simply a method of collecting a debt or a means of receiving payment," and they are "not the claim upon which the lien is founded." 53 Am. Jur. 2d Mechanics' Liens § 1 (2025).

While these liens were unknown at common law and in equity, they trace their lineage at least as far back as France's Napoleonic Code. *Moore-Mansfield Constr. Co. v. Indianapolis, New Castle & Toledo Ry. Co.*, 101 N.E. 296, 301 (Ind. 1913). They were first introduced in the United States as a tool for developing the new capital city of Washington, D.C., and Indiana enacted its first mechanic's lien statute in 1834. *Id.*; *see generally* Note, *Mechanics Liens in Indiana—The Extent of the Property and Property Interests Subject to the Lien*, 36 Ind. L. J. 526, 529 (1961). "The historical origin and purpose of mechanic's lien statutes was to make a property owner an involuntary guarantor of payments for the reasonable value of improvements made to real estate by the physical labor or materials furnished by laborers or materialmen." *Premier Invs. v. Suites of Am., Inc.*, 644 N.E.2d 124, 130 (Ind. 1994). This prevents "the inequity of a property owner enjoying the benefits of the labor and materials furnished by others without recompense." *Id.*

Garmong and Fox contend they are entitled to foreclose their construction liens on EdgeRock's and ZPS's properties because they improved those properties through work and materials for which they have not been paid. EdgeRock and ZPS both acknowledge the contractors had statutory lien rights for unpaid work, but they argue the liens are invalid here because, they contend, the liens were grossly overstated and untimely. If, on the other hand, the contractors can foreclose their liens, then First Bank argues any property sale proceeds must first go to repay

its $4.9 million loan because, either as a matter of statutory lien priority or equitable subrogation, the bank's mortgage lien is senior to the contractors' construction liens.

In Section I below, we analyze the scope and validity of Garmong's and Fox's construction liens, concluding that the liens are valid for improvements directly benefiting the properties to which they attach, but not for improvements directly benefiting another owner's property. Then, in Section II, we analyze the lien priority between the construction liens and the mortgage lien, concluding that the mortgage lien is senior as security for the loan funds that went to satisfying Garmong's previous lien, but junior to the construction liens for the remaining funds.

# I.     Scope and Validity of the Construction Liens

The trial court foreclosed Garmong's and Fox's construction liens against ZPS's and EdgeRock's lots. On appeal, EdgeRock and ZPS pursue a three-prong challenge to those liens. First, EdgeRock and ZPS argue the liens are invalid because the statute did not permit Garmong and Fox to secure their debts in duplicate (sometimes triplicate) by filing redundant liens against multiple properties with different owners, all covering the same labor and materials. Second, EdgeRock and ZPS argue the liens are invalid because they were recorded too late. And third, they assert various challenges to the underlying debts that the liens secure.

While we agree with EdgeRock and ZPS that each lien can secure no more than the debt for the improvements to the property attached to the lien, we otherwise affirm the trial court's judgment as to the validity of the liens and the debts they secure.

## A.     Lien Duplication

Garmong and Fox contend they could assert duplicate liens on properties with different owners because all their work was connected by contracts through a single overarching development plan. That is, Garmong contends it was proper to assert a lien against EdgeRock's Lots 4 and 5 for the unpaid balance of $943,042.64, and then to assert another lien

for the same amount covering the same work against ZPS's Lots 1 and 2. Fox takes the same position: It was proper for Fox to assert a lien against EdgeRock's Lots 4 and 5 for the unpaid balance of $1,303,531.37, and then to assert another lien for the same amount covering the same work against ZPS's Lots 1 and 2. Garmong and Fox's position is based on the view that "when there are multiple lots with multiple owners, the structure of the contract is key and lien rights follow the contract even without common ownership." C.H. Garmong & Son, Inc.'s and Fox Contractors Corp.'s Joint Pet. to Trans. at 15.

EdgeRock and ZPS disagree. They contend that when contractors work on properties with different owners, the contractors must allocate the debts between properties, or at least between property owners, even when all the work stems from a single contract. Here, that would mean Garmong's and Fox's liens against EdgeRock's property could cover only improvements to that property, and their liens against ZPS's property could cover only improvements to that property.

Four reasons lead us to agree with EdgeRock and ZPS that duplicate liens are improper, which we discuss next. After that, we explain, as Garmong and Fox argue, the remedy for the lien overstatement is to reduce the liens, not, as EdgeRock and ZPS argue, to invalidate them in their entirety.

### 1. Statutory Language

The first reason we agree with EdgeRock and ZPS is that the statutory language ties liens to property ownership, with no mention of contracts. The statute says the lien attaches to (1) the structure or improvement itself (for example, a building), and (2) "the **interest of the owner** of the lot or parcel of land" on which the structure or improvement stands or to which the structure or improvement is connected. I.C. § 32-28-3-1(b) (emphasis added). "The entire land upon which the building, erection, or other improvement is situated, including the part of the land not occupied by the building, erection, or improvement, is subject to a lien to the extent of the right, title, and interest of the **owner for whose immediate use or**

**benefit** the labor was done or material furnished." I.C. § 32-28-3-2(a) (emphasis added).

Despite these references to property ownership, Garmong and Fox argue the statute links their lien rights to the contract compelling their labor and materials, not to the ownership interest in the improved property. For support, they point to other statutory language saying that liens cover improvements "connected" to property. I.C. § 32-28-3-1(b)(2)(B). To say that something is "connected" to property generally means that it is "joined or linked together" with the property. *Connected*, Merriam-Webster, https://www.merriam-webster.com/dictionary/connected [https://perma.cc/JER5-B4R9] (last visited June 3, 2025). And Garmong and Fox view a contract to improve multiple lots as joining or linking each improvement to all the lots subject to the contract.

But this argument fails because the statutory context makes clear that is not what the legislature meant by "connected," and the legislature was instead referring to a *physical* connection. *See Hyland v. Rochelle*, 100 N.E. 842, 849 (Ind. 1913) (explaining that the meaning of statutory terms "is to be collected from the context" (quotations omitted)). The statutory term "connected" is part of the provision establishing the scope of a lien:

> A person described in subsection (a) may have a lien separately or jointly:
>
> (1) upon the house, mill, manufactory, or other building, bridge, reservoir, system of waterworks, or other structure, sidewalk, walk, stile, well, drain, drainage ditch, sewer, cistern, or earth:
>
>> (A) that the person erected, altered, repaired, moved, or removed; or
>>
>> (B) for which the person furnished materials or machinery of any description; and
>
> (2) on the interest of the owner of the lot or parcel of land:

(A) on which the structure or improvement stands; or

(B) with which the structure or improvement is **connected**;

to the extent of the value of any labor done or the material furnished, or both, including any use of the leased equipment and tools.

I.C. § 32-28-3-1(b) (emphasis added).

Subparts (2)(A) and (2)(B) above use different prepositional phrases so that together they authorize liens for all categories of structures and improvements listed in Subpart (1). Subpart (2)(A) authorizes a lien for the property "on which the structure or improvement stands." I.C. § 32-28-3-1(b)(2)(A). Those structures and improvements "on" the property would include a "house, mill, manufactory, or other building" listed in Subpart (1). Those same examples are also listed earlier in the statute when establishing which vendors and which work qualify for a lien. I.C. § 32-28-3-1(a)(1)(A) (allowing a lien for the "erection, alteration, repair, or removal of . . . a house, mill, manufactory, or other building").

But some structures or improvements do not necessarily stand "on" the property, or at least not "on" the portion of property subject to the lien. So Subpart (2)(B) authorizes a lien for property "with which the structure or improvement is connected," I.C. § 32-28-3-1(b)(2)(B), even if the structure or improvement is not "on" the property, I.C. § 32-28-3-1(b)(2)(A). Again, Subpart (1) gives examples of improvements that are physically connected to a property: a "bridge, reservoir, system of waterworks, or other structure, sidewalk, walk, stile, well, drain, drainage ditch, sewer, [or a] cistern." I.C. § 32-28-3-1(b)(1). And again, that list mirrors the examples earlier in the statute establishing which vendors and which work qualify for a lien. I.C. § 32-28-3-1(a) (allowing a lien for the "erection, alteration, repair, or removal of . . . a bridge, reservoir, system of waterworks, or other structure," as well as "the construction, alteration, repair, or removal of a walk or sidewalk located on the land or bordering the land, a stile, a well, a drain, a drainage ditch, a sewer, or a cistern"). All these examples

either tie portions of the land together or link the property with other property.

From the statutory context, then, we can see the term "connected" denotes a physical connection, linking portions of the property together or linking the property to other property. Nothing in the statute suggests the term means something else, like a connection to the property through a contract, as Garmong and Fox propose.

### 2.    Case Law

The case law confirms our interpretation, rejecting Garmong and Fox's view that a lien's scope depends on whether all the work stems from a single contract. *See Shilling v. Templeton*, 66 Ind. 585, 587 (1879) ("It is the law and not the contract that gives the mechanic his lien."). For example, in *Saint Joseph's College v. Morrison, Inc.*, the Court of Appeals described as "an erroneous conclusion of law" the view that "a valid mechanic's lien cannot embrace work done under two separate contracts." 302 N.E.2d 865, 871 (Ind. Ct. App. 1973). The court explained that what has generally mattered throughout the cases is not the number of contracts but whether all the work subject to the lien (a) occurred "on one plot of real estate" and (b) was "pursuant to a common plan of improvement" for that property. *Id.* at 872; *see also id.* at 873 (recognizing that prior case law held that a joint lien was proper for material furnished under "two distinct contracts" because "all of the items were furnished for the same improvement upon one piece of property"). The fact that work was performed pursuant to a single contract may be evidence that the work was pursuant to a common plan of improvement, but that does not mean all the work improved the same plot of land, so the contract does not by itself determine whether a joint lien is proper.

Garmong and Fox read the case law differently. The first category of cases they rely on allows "joinder of claims in cases where such joinder will not prejudice the rights of the property owner." *Id.* at 874. For example, in *Premier Steel Co. v. McElwaine-Richards Co.*, we affirmed the foreclosure of McElwaine-Richards's lien for the steam, gas, and water pipes it supplied to Premier Steel Company for extensive renovations

throughout a steel plant even though the supplier didn't separate the orders by the "particular mill or building" that used the pipes. 43 N.E. 876, 877 (Ind. 1896). Our decision was based on the rule that:

> Where labor is performed or materials furnished under one contract upon several buildings, all situate upon one lot of land **belonging to the contracting owner**, the lien attaches to all the land for the whole value of the labor performed, and it is immaterial whether the contract specifies one sum for all work or separate amounts for each building.

*Id.* at 877–78 (emphasis added) (quoting Jones, Liens, § 1313).

As later case law explained, the key takeaway from *Premier Steel Co.* is that where all the work was done on a single piece of property, there is "no valid public purpose in promoting multiple notices and foreclosures in situations where a single lien would suffice." *Saint Joseph's Coll.*, 302 N.E.2d at 874. Instead, the cases recognize "a policy of avoiding needless multiplicity of proceedings." *Id.* But as the bolded language above reflects, it was critical to our holding in *Premier Steel Co.* that the multiple buildings subject to a single lien all had the same owner. If the buildings had different owners, then it would "prejudice the rights of the property owner" to include in the lien the value of improvements to another owner's property. *Id.*

Another case in this category that Garmong and Fox cite is *West v. Dreher*, 126 N.E. 688 (Ind. App. 1920). Dreher owned two adjoining lots, and he built a house on each. The plaintiffs supplied labor and materials for both houses and then recorded a single lien against both houses for the unpaid balance. The Appellate Court (now the Court of Appeals) held: "Where a contractor, under a single contract, has furnished materials and performed labor in the construction of two separate dwelling houses, one house on each of two contiguous lots, the labor and materials having gone indiscriminately into the construction of both houses," the contractor is "entitled, by a single notice, to a lien on both houses and lots." *Id.* at 689. The court reasoned that "the two houses, within the mechanics' lien law of this state, are one piece of work" and therefore subject to a single lien. *Id.*

Again, and critically, both neighboring lots had the same owner, so there was no need to require separate liens. The relevance of the contract was just to establish that the property owner approved the improvements and that they were all part of a common plan. Nothing in the case suggests the court would have permitted a joint lien on both houses if they had different owners.

The second category of cases on which Garmong and Fox rely recognizes that property may be subject to a lien even when the improvements are offsite. In *Wells v. Christian*, 76 N.E. 518 (Ind. 1906), a boiler operator hired a contractor to install steam-distribution pipes under a neighboring street, and the contractor sued to foreclose a lien on the operator's property for the unpaid balance. We held the lien could be foreclosed, explaining that "[t]he mains and pipes laid down in the streets and elsewhere to distribute the steam among those who are to enjoy the beneficial use of it are clearly a part of the apparatus necessary to accomplish the objects for which such heat plant was erected." *Id.* at 519.

In other words, the steam pipes connected to the property "constitute a part of the machinery by means of which the business of supplying heat to others must be carried on." *Id.* Because the work was "directly and necessarily connected with the erection of the appellee's heating system, . . . it was an immaterial matter whether such work was performed upon the particular premises to which the labor lien primarily attached." *Id.*

Again, we affirmed the foreclosure because the lien covered the value of improvements benefiting the property subject to the lien; we did not approve a lien covering the value of improvements to someone else's property who did not consent to the debt. *Wells* also illustrates the physical connection the statute requires. The steam pipes physically linked customers to the heating plant. So in the statutory parlance, while the pipes weren't "on" the property with the heating plant, they were "connected" to that property. I.C. § 32-28-3-1(b)(2)(A) & (B).

As Garmong and Fox acknowledge, "[n]o Indiana case has addressed these facts where work was performed under one contract on multiple lots with different owners" and a contractor asserted duplicate liens for all the work against each improved property. C.H. Garmong & Son, Inc.'s and

Fox Contractors Corp.'s Joint Pet. to Trans. at 2. The cases to date suggest a joint lien cannot cover property with different owners. And allowing a joint lien to cover improvements to separate properties with separate owners where one owner did not consent to the work benefiting another's property would conflict with a fundamental requirement of construction liens, which leads to the next reason we agree with EdgeRock and ZPS's interpretation of the lien statute.

### 3.    Consent

One lien requirement is that the property owner must have consented to the improvements to their property. *Gill v. Pollert*, 810 N.E.2d 1050, 1058 (Ind. 2004); *see generally* 19 Ind. Law Encyc. Mechanics' Liens § 18 (2025) ("The creation of a mechanic's lien requires the authorization or consent of the property owner to the improvement in question."). This is consistent with the lien's theoretical underpinning as a tool to prevent unjust enrichment, a claim which also includes consent as an element. *See Kohl's Indiana, L.P. v. Owens*, 979 N.E.2d 159, 167–68 (Ind. Ct. App. 2012) ("Indiana courts articulate three elements for this claim: (1) a benefit conferred upon another at the express or implied consent of such other party; (2) allowing the other party to retain the benefit without restitution would be unjust; and (3) the plaintiff expected payment."); *Lee & Mayfield, Inc. v. Lykowski House Moving Eng'rs, Inc.*, 489 N.E.2d 603, 608 (Ind. Ct. App. 1986) ("The statutory lien is equitable in nature and based upon the theory of unjust enrichment.").

For a lien, the "consent must be more than inactive or passive consent, and the lien claimant's burden to prove active consent is especially important when the improvements are requested by someone other than the landowner." *Gill*, 810 N.E.2d at 1059 (quotations omitted). We've acknowledged that "[t]he exact nature and content of the owner's active consent in this context will vary from case to case." *Id.* (quotations omitted). But "case law makes clear that the focus is not only on the degree of the owner's active participation in the decisions and the actual construction." *Id.* (quotations omitted). The focus is "also on how closely

the improvements in question resemble a directly bargained-for-benefit." *Id.* (quotations omitted).

Allowing duplicate liens that cover work directly benefiting other owners' properties would undermine this requirement. For example, a homeowner might expressly or impliedly consent to work connecting their lot to a development through a sidewalk, road, sewer, or other utilities. And as a result, they may be required to shoulder through a lien their portion of the cost of those improvements directly benefiting their property. But it would be quite a stretch to suggest that single homeowner consented to, and effectively bargained for, the development of the rest of the broader network of sidewalks, roads, sewers, and utilities that connect everyone else in the neighborhood along with their lot. *See generally* 53 Am. Jur. 2d Mechanics' Liens § 46 (2025) ("As a general rule, a mechanic's lien attaches only to the estate or interest of the person who, directly or through an agent, creates the lien by contracting for the labor or materials, and accordingly only such party's interest can be subjected to a sale to satisfy the lien.").

So each property owner must pay their own way, but that means paying only for the improvements they effectively consented to and bargained for, which takes us to our final point.

### 4. Guarantor

Garmong and Fox's statutory interpretation would convert property owners to guarantors of other property owners' debts. But that isn't the function of a construction lien under Indiana law.

To be sure, a lien makes "a property owner an involuntary guarantor of payments for the reasonable value of improvements made to real estate by the physical labor or materials furnished by laborers or materialmen." *Premier Invs. v. Suites of Am., Inc.*, 644 N.E.2d 124, 130 (Ind. 1994). But that is for improvements to the property owner's *own* property, not someone else's property. Again, the scope of the lien is limited to "the right, title, and interest of the owner for whose immediate use or benefit the labor was done or material furnished." I.C. § 32-28-3-2(a).

"A lien cannot exist without the existence of a debt which, under the statute, it secures." *Mann v. Schnarr*, 95 N.E.2d 138, 141 (Ind. 1950). Garmong and Fox already obtained a money judgment against EdgeRock for the money it owed them under the parties' contract and failed to pay. And ZPS already paid EdgeRock for the property improvements it consented to. But ZPS never agreed to guarantee EdgeRock's debts. So just as ZPS isn't a guarantor of EdgeRock's money judgment, ZPS also isn't a guarantor of EdgeRock's debts for improvements to EdgeRock's property through a lien on ZPS's property. *See McGrew v. McCarty*, 78 Ind. 496, 498 (1881) ("[O]ne can no more be made to discharge the debt of another building than one individual debtor can be made to pay a separate claim owing by somebody else to the same creditor.").

By analogy, consider again a typical housing development. Our lien statute codifies a policy that a homeowner who actively consents to their property being improved through a connection to the neighborhood's sidewalks, streets, sewer, and other utilities might be compelled to guarantee the debt for the costs of their connection. But it does not follow that the same homeowner should also shoulder the costs for improvements to other homeowners' properties. It is one thing to give a contractor a security interest in property it has improved; it is quite another to make that property owner the guarantor for the debts of all the surrounding property owners.

Having concluded that EdgeRock and ZPS are correct that Garmong's and Fox's duplicate liens are improper, we must turn to determining the remedy.

## B.    Lien Reduction

The trial court did not allocate the lien amounts between EdgeRock's and ZPS's properties because the court mistakenly believed each contractor could apply the entire debt to both property owners. EdgeRock and ZPS argue, and the Court of Appeals agreed, that Garmong's and Fox's overstatement of their liens renders them void. But no reported case in Indiana has ever held that a lien was void because the vendor overstated the amount owed, and this case should not be the first.

Our Court of Appeals has observed that where a party "intentionally or through culpable negligence" overstates the lien amount, the overstatement voids the whole lien. *Abbey Villas Dev. Corp. v. Site Contractors, Inc.*, 716 N.E.2d 91, 100–01 (Ind. Ct. App. 1999) (quotations omitted). But that same authority recognizes that "a mere mistake in the statement will not necessarily render the whole lien void when it is evident that no fraud is intended, and where it has not misled the defendant owner to his prejudice in making his defense." *Id.* (quotations omitted). Both sides accept these statements as accurate reflections of Indiana law.

The trial court held that even if Garmong and Fox overstated the lien amount, the overstatement does not void their liens because the overstatement was based on a good faith dispute about Indiana law; it was an open question whether the liens tracked the contract or property ownership. Neither EdgeRock nor ZPS point to any basis on which we could conclude the trial court misapprehended the law when concluding that a lien is not void when an overstatement is based on a good faith legal dispute, nor do they point to any evidence that Garmong or Fox acted fraudulently.

We therefore conclude the trial court did not clearly err by declining to void the liens based on overstatement. But the liens on each property still need to be revised to reflect the materials and services directly improving the property to which each lien attaches. Next, we apply that limitation to the three pairs of liens.

### 1.  Garmong's Liens for Improvements Under the EdgeRock-Garmong Contract

The trial court approved $943,042.64 (plus fees and interest) for Garmong's duplicate liens against (a) ZPS's Lots 1 and 2, and (b) EdgeRock's Lots 4 and 5. Those liens reflect Garmong's final two unpaid invoices (Invoices 6224-10 and 6224-11) for the EdgeRock-Garmong contract, which was a contract (a) to construct buildings on Lots 1 and 2, and (b) to construct common infrastructure (including grading, sewer, and water) for all lots.

We start with the work related to constructing buildings on ZPS's Lots 1 and 2. As we discussed above, the lien for those improvements can attach only to the property directly benefited, so the lien amounts for constructing buildings on ZPS's lots can attach only to those lots, not EdgeRock's lots. And for the building construction on ZPS's lots, there is no dispute that ZPS approved the construction, that the construction directly improved ZPS's property, and that it was therefore proper for Garmong to assert a lien for those improvements. As to ZPS, the dispute is only over which charges on Invoices 6224-10 and 6224-11 relate to constructing the buildings on ZPS's lots instead of work and materials for common infrastructure improving other owners' properties.

The trial court examined the invoices and concluded that the line items totaling "$520,509.70 for Masonry, Metal Panels, Membrane Roofing, Ipe Siding, Entrances and Storefronts, Painting, Plumbing and HVAC, Electrical, Asphalt Paving, Fences and Gates, Landscaping, and [Change Order] #4" reflect work and materials that "went directly into ZPS's buildings and land." App. Vol. 2 at 153, ¶ 48. ZPS does not claim these charges were for work or materials that went somewhere other than to directly improve its Lots 1 and 2. It instead argues there is no evidentiary support for the trial court's finding.

We disagree. The only building construction under the Garmong-EdgeRock contract was for the two buildings on ZPS's Lots 1 and 2, so it was reasonable for the trial court to infer that these building-related construction charges were for ZPS's lots. Thus, we affirm the trial court's judgment as to a lien on ZPS's Lots 1 and 2 for $520,509.70.

Beyond that, though, the evidence does not support the trial court's conclusion that "the full $943,042.64 owed on invoices 6224-10 and 6224-11 directly benefited ZPS's property." App. Vol. 2 at 153, ¶ 52. Just the opposite—Garmong's Regional Manager, Mitch Hannum, who was involved in calculating the lien amount, testified that the amounts were not apportioned by lot, and the lien amounts include work on all five lots. Similarly, Garmong's Chief Financial Officer, Michael Preyss, who executed the lien on Garmong's behalf, testified he does not know the allocation of the lien amounts between lots.

Despite this testimony, the trial court inferred from Fox's pay applications as a subcontractor that this work benefited ZPS. On appeal, the closest Garmong comes to justifying the attribution of these remaining expenses to ZPS is to say that the "bulk" of some of the categories of charges should be attributable to ZPS, and that other charges benefited ZPS in an unspecified "part." Br. of Appellee C.H. Garmong & Sons, Inc. at 46. But ZPS is responsible only for those improvements it consented to for the direct benefit of its own property; it is not responsible for other amounts merely because they *include* an unspecified *portion* that directly benefited ZPS's property. The lien on ZPS's Lots 1 and 2 must therefore be reduced to $520,509.70, reflecting the building expenses to which ZPS consented and which directly benefited ZPS's property.

Because there is no finding that the remaining amount is attributable to improvements directly benefiting EdgeRock's property—and the evidence is that the work was across all five lots—EdgeRock's Lots 4 and 5 are not subject to a construction lien for any of the $943,042.64. That said, while EdgeRock's property is not subject to a *construction* lien for any of that amount, the property remains subject to a *judgment* lien for the entire amount based on Garmong's successful breach of contract claim against EdgeRock. (We recognize that a judgment lien has a lower priority than a construction lien, though.)

Also, ZPS already paid EdgeRock for the improvements to its property that are the subject of the liens against Lots 1 and 2, and it was EdgeRock that failed to pass along ZPS's payment to Garmong. So to minimize the extent to which ZPS will otherwise pay for the same work twice, the trial court ordered that EdgeRock's Lots 4 and 5 must be sold first, and any sums paid to Garmong from that sale will reduce the judgment against ZPS in the same amount. No party has challenged that instruction on appeal, and we leave it undisturbed.

The trial court also mistakenly included pre-judgment interest in its award to Garmong against ZPS. Garmong argues pre-judgment interest "is warranted if the contract terms make the claim ascertainable and the amount rests upon mere calculation." Br. of Appellee C.H. Garmong & Son, Inc. at 52 (quoting *Johnson v. Blankenship*, 679 N.E.2d 505, 509 (Ind. Ct.

App. 1997), *summarily aff'd*, 688 N.E.2d 1250 (Ind. 1997)). But the claim did not rest upon mere calculation because Garmong declined to allocate the charges by lot, so it was only through trial that ZPS could learn how to excise its debt from others' debts for which ZPS was not a guarantor. *See Pichon v. Am. Heritage Banco, Inc.*, 983 N.E.2d 589, 601 (Ind. Ct. App. 2013) ("Damages that are the subject of a good faith dispute cannot allow for an award of prejudgment interest."), *trans. denied.*

In sum, although Garmong's *construction* liens against EdgeRock's Lots 4 and 5 are invalid, its *judgment* liens against EdgeRock remain valid. Garmong's construction liens on ZPS's Lots 1 and 2 are valid only for the amount of $520,509.70,[3] and they may be enforced only if the sale of EdgeRock's Lots 4 and 5 does not satisfy the debt.[4]

## 2. Fox-Garmong Subcontract

Garmong engaged Fox as a subcontractor under the EdgeRock-Garmong contract "to provide earthmoving and common utility and private infrastructure work in the Project (the 'Garmong Subcontract')." App. Vol. 2 at 128, ¶ 125. The subcontract price was $1,315,000, and Garmong and Fox have stipulated that $202,623.56 of that amount remains unpaid.

The trial court concluded that Fox could assert duplicate liens for this debt against both EdgeRock's and ZPS's properties. It found that "[t]he common utility and infrastructure work in the Project was phased across the entire Project, and Fox performed this common infrastructure and

---

[3] ZPS incorporates EdgeRock's argument that Garmong's liens were not timely, but the arguments for these charges are specific to EdgeRock's lots. ZPS does not make a timing argument specific to the charges that we have concluded the trial court properly validated for the liens on Lots 1 and 2. We therefore do not disturb the trial court's conclusion that Garmong's liens were timely as to ZPS.

[4] We summarily affirm the holding of the Court of Appeals that the trial court did not err in concluding that factual disputes precluded summary judgment on EdgeRock's claim that Change Order #3 was invalid because it was not approved in writing. *EdgeRock Dev., LLC v. C.H. Garmong & Son, Inc.*, 227 N.E.3d 907, 931–32 (Ind. Ct. App. 2024).

utility work in accordance with the general phasing of the Project's infrastructure plans." App. Vol. 2 at 154, ¶ 63(d). The trial court further found that the work "benefit[s] the entire development." *Id.* ¶ 64(e).

We affirm the trial court's judgment for this amount as to EdgeRock but not ZPS. The "trial court's judgment comes to this court clothed with a presumption of validity, and the appellant bears the burden of proving that the trial court erred." *Consumer Att'y Servs., P.A. v. State*, 71 N.E.3d 362, 364 (Ind. 2017) (quotation omitted). On appeal, EdgeRock does not dispute that these specific remaining charges were for infrastructure improvements on or connecting to its lots, that it requested these improvements, and that the improvements directly benefited its property.

Instead, EdgeRock claims it was entitled to summary judgment based on its argument that Fox did not record its lien within the statutorily required ninety days. But as the trial court appropriately concluded, the lien was timely because "Fox last performed common utility and infrastructure work for the Project under the Edgerock Contract on June 3, 2019," which was less than ninety days before Fox recorded its lien on EdgeRock's Lots 4 and 5 on August 30, 2019. App. Vol. 2 at 138, ¶ 150. And we find no error in the trial court's conclusion that the work fell within the scope of the Garmong subcontract, rather than reflecting merely incidental repair work as EdgeRock suggests.

EdgeRock also argues that Garmong's and Fox's liens are invalid because Garmong expressly released "any and all claims and liens" against EdgeRock "by reason of labor, materials or equipment furnished by it in connection with" Garmong's "installation of the water and sanitary mains under the contract." Br. of Appellant EdgeRock Development, LLC at 62 (quoting Release of Liens, App. Vol. 5 at 142); *see also* Br. of Appellant ZPS Westfield, LLC at 57 (joining EdgeRock's argument). But the parties' briefing does not reveal what, if any, portion of the liens relate to the water and sanitary mains. And if any portion does, that would be a reason to *reduce* rather than *invalidate* the liens, as discussed above. The trial court therefore did not err by declining to invalidate the liens through summary judgment on this basis, and

EdgeRock does not challenge the trial court's findings and conclusions on this same basis.

ZPS is in a much different position than EdgeRock, though, because it did not consent to the work on EdgeRock's lots under the Garmong-Fox subcontract. We therefore reverse the trial court's judgment validating these liens on ZPS's Lots 1 and 2.

### 3. 175th Street Project

Lastly, the trial court approved Fox's duplicate $1,166,728.23 liens against EdgeRock's and ZPS's properties for outstanding debts stemming from the 175th Street Project.[5] For that project, Fox "entered into a direct contract with Edgerock to construct 175th Street, to provide additional common utility work for the Project, and to relocate the Anna Kendall Drain." App. Vol. 2 at 131, ¶ 133. This work consisted of:

- Clearing and demolition work and erosion control;

- Excavated existing Anna Kendall Drain, placed stone base and then filled the area with B-Borrow;

- Relocated and stabilized Anna Kendall Drain;

- Installed stormwater infrastructure end along 175th Street, including piping and [outlet] into detention pond;

- Excavated part of detention pond southeast of lift station;

---

[5] EdgeRock argues this lien was also untimely. The trial court concluded that the lien was timely because Fox's work under this contract continued until June 3, 2019, less than ninety days before Fox recorded its lien on EdgeRock's Lots 4 and 5 on August 30, 2019. Again, we find no error in the trial court's conclusion.

- Installed box culvert extension on east side of Oakridge Road – extended existing culvert with the relocation of the Anna Kendall Drain;

- Graded and prepped roadway from first 200 feet east to connect to Wheeler Road, and paved in front of Crew Carwash area;

- Installed part of the waterline that was to continue on east to connect into the main at the end to complete the loop all the way to Wheeler Road.

App. Vol. 2 at 132–33, ¶ 137 (letters replaced with bullet points).

Some of the work was "actually performed on the Edgerock Real Estate," and the remainder "would benefit the entire Project" because it "made the development of the entire Project possible," which no party disputes on appeal. App. Vol. 2 at 132–33, ¶¶ 136, 138. Those findings are sufficient to support the trial court's conclusion that the liens on EdgeRock's Lots 4 and 5 for these improvements are valid. EdgeRock requested all this work; the work was for infrastructure physically connected to EdgeRock's lots; and all the work directly benefited EdgeRock's property and its commercial enterprise, much as physically connecting the infrastructure to the boiler operation in *Wells* was "necessary to accomplish the objects for which" the "plant was erected." 76 N.E. at 519.[6]

But again, it is a different story with ZPS. While these improvements indirectly benefited ZPS's lots by making them amenable to development, ZPS never bargained for or consented to this work, and there is no

---

[6] We summarily affirm the holding of the Court of Appeals that the trial court did not err in granting Garmong's summary judgment motion (and denying EdgeRock's competing summary judgment motion) on EdgeRock's claim that it was entitled to a credit for amounts owed under the EdgeRock-Garmong contract for work related to the 175th Street Project and the drain relocation. *EdgeRock Dev., LLC*, 227 N.E.3d at 932 (Ind. Ct. App. 2024).

evidence that ZPS would have agreed to develop Lots 1 and 2 had it known it would be responsible for preparing the lots for development along with preparing the surrounding lots for development too. In other words, unlike EdgeRock, ZPS never agreed to be a guarantor of the debts for this work.

Thus, for the amounts due under the EdgeRock-Fox contract, we affirm the trial court's foreclosure of Fox's liens on EdgeRock's property but reverse Fox's judgment against ZPS.

## II.   Lien Priority

Because Garmong's and Fox's lien foreclosures force the sale of EdgeRock's Lots 4 and 5, we must next determine the order—the priority—that those sale proceeds will be applied to (a) the debts that the construction liens secure, and (b) the $4.9 million debt that First Bank's mortgage lien secures. To recap, this is the timeline of relevant events for that dispute:

| March 31, 2016 | Oak Ridge Investments mortgaged Lots 4 and 5 to secure the purchase of the lots. |
| Dec. 4, 2018 | Garmong recorded a $2,140,722.51 lien on Lots 4 and 5. |
| Feb. 25, 2019 | First Bank recorded a mortgage lien on Lots 4 and 5 to secure its $4.9 million loan to EdgeRock after: (a) EdgeRock used some of the bank's loan proceeds to satisfy Garmong's December 2018 lien; (b) EdgeRock used other of those loan proceeds to satisfy the Oak Ridge Investments' mortgage; and (c) Oak Ridge Investments quitclaimed Lots 4 and 5 to EdgeRock. |
| Aug. and Sept. 2019 | Garmong and Fox recorded construction liens on Lots 4 and 5 covering work that began before First Bank recorded its mortgage lien. |

The parties and the trial court all agree that the bank's mortgage lien is senior for the $2,140,722.51 the bank loaned EdgeRock to satisfy Garmong's December 2018 construction liens, but the trial court concluded the construction liens were senior to the mortgage lien securing the remainder of the loan proceeds.

On appeal, the bank argues its mortgage lien is senior for all the funds its lien secures for three reasons. First, the bank recorded its lien before Garmong and Fox recorded their liens. Second, even if the construction liens would otherwise be senior, there is a statutory exception granting seniority to a mortgage lien that secures construction project financing. And the bank claims all the funds it loaned EdgeRock qualify under this exception, not just the funds to satisfy Garmong's prior lien. Third, the bank argues that equitable subrogation puts its mortgage lien in the same priority position as the previous mortgage that the bank's loan funds satisfied.

We address the bank's three arguments in turn, ultimately agreeing with Garmong and Fox as to each.

### A. Construction lien priority is determined by the date work begins, not the date the lien is recorded.

Generally, "priority in time gives a lien priority in right." *Johnson v. Johnson*, 920 N.E.2d 253, 256 (Ind. 2010). So the bank's first argument is that its mortgage lien is senior because its lien was prior in time—the bank recorded its lien before Garmong and Fox recorded their construction liens. *See* I.C. § 32-21-4-1(c) (providing that a mortgage lien "takes priority according to the time of its recording"). But that argument fails because while the recording date establishes the priority date for a mortgage lien, the recording date does not establish the priority date for a construction lien.

Instead, when a lienholder records a construction lien, the priority date relates back to the date when the lienholder began performing labor or providing materials or machinery. The relevant statute provides:

The recorder shall record the statement and notice of intention to hold a lien when presented under section 3 of this chapter in the miscellaneous record book. The recorder shall charge a fee for recording the statement and notice in accordance with IC 36-2-7-10. When the statement and notice of intention to hold a lien is recorded, the lien is created. **The recorded lien relates back to the date the mechanic or other person began to perform the labor or furnish the materials or machinery.** Except as provided in subsections (c) and (d), a lien created under this chapter has priority over a lien created after it.

I.C. § 32-28-3-5(b) (emphasis added). Because the parties agree that Garmong and Fox began their work before First Bank recorded its mortgage lien, the trial court properly found that their construction liens were prior in time and therefore generally have priority over the mortgage lien.

First Bank argues the trial court's conclusion reflects a legal error because the bank reads the construction lien priority provision as establishing priority based on the date of recording—just like a mortgage lien—not the date the construction lienholder began performing work or supplying materials or machinery. As First Bank reads the statute, the lien is "created" when it is recorded, which establishes lien *priority*. I.C. § 32-28-3-5(b). And the relation-back provision refers to the *scope* of the debt that the lien secures, allowing the lien to secure debt for work, materials, and machinery provided before the lien was recorded.

But more than 150 years' worth of cases from our Court and the Court of Appeals say otherwise, interpreting similar statutory relation-back provisions as establishing a construction lien's priority, not just its scope. *See* 5 *Tiffany Real Prop.* § 1578 (3d ed. 2024) (including Indiana among the states where construction lien priority is established "when the person asserting the lien first began to furnish the labor or materials for which the

lien is claimed").[7] And that case law mirrors how courts around the country interpret these sorts of relation-back provisions in lien statutes. *See* 1 Alvin L. Arnold and Myron Kove, *Construction & Development Financing* § 4:247 (3d ed. 2024) ("Mechanics liens statutes often permit the

---

[7] *See also Ward v. Yarnelle*, 91 N.E. 7, 14 (Ind. 1910) (stating that "where some labor is performed, or material is furnished prior to the execution of a mortgage, in which event, upon notice being filed within the statutory period, though after the mortgage is given, the lien reaches back of the mortgage to the time when the work is begun or the material furnished, and gains priority both as to the land and the building"), *overruled on other grounds by Moore-Mansfield Constr. Co. v. Indianapolis, New Castle & Toledo Ry. Co.*, 101 N.E. 296 (Ind. 1913); *Jenckes v. Jenckes*, 44 N.E. 632, 634 (Ind. 1896) (explaining that a mechanic's lien's priority was measured by "the time when work was begun or material furnished"), *overruled on other grounds by Sulzer-Vogt Mach. Co. v. Rushville Water Co.*, 65 N.E. 583 (Ind. 1902); *Fleming v. Bumgarner*, 29 Ind. 424, 425 (1868) ("A fair construction of the law is, that the lien of a mechanic or material man relates to the time when the work commenced, or the materials began to be furnished, as to subsequent conveyances as well as to other liens."); *Wells Fargo Bank, N.A. v. Rieth-Riley Constr. Co.*, 38 N.E.3d 666, 671 (Ind. Ct. App. 2015) (explaining that the priority of the mechanic's lien was measured by when "the mechanic's work was begun or materials [were] furnished"); *Provident Bank v. Tri-Cnty. Southside Asphalt, Inc.*, 804 N.E.2d 161, 163 (Ind. Ct. App. 2004) (measuring the mechanic's lien priority from the date when the lienholder "began paving the driveway"), *on reh'g in part*, 806 N.E.2d 802 (Ind. Ct. App. 2004); *Greyhound Fin. Corp. v. R.L.C., Inc.*, 637 N.E.2d 1325, 1327 (Ind. Ct. App. 1994) ("Before a proper notice has been recorded, only a latent, unperfected mechanic's lien exists. When the notice is recorded, the lien is perfected and its priority is determined by the date the lien claimant began work on the property."); *Beneficial Fin. Co. v. Wegmiller Bender Lumber Co.*, 402 N.E.2d 41, 43 (Ind. Ct. App. 1980) (holding that a mechanic's lien had priority where materials were furnished before the mortgage was recorded and the mechanic's lien was recorded after the mortgage); *Stanray Corp. v. Horizon Constr., Inc.*, 342 N.E.2d 645, 650 (Ind. Ct. App. 1976) (explaining that a mechanic's lien has priority "where, for example, the mechanic's earliest work or delivery of materials antedates recordation of the competing mortgage"); *Krotz v. A.R. Beck Lumber Co.*, 73 N.E. 273, 278 (Ind. App. 1905) (explaining that a properly recorded mechanic's lien "would have been effective from the time the materials were furnished, and would have had priority over all liens suffered or created thereafter, except the liens of other mechanics and materialmen, as to which there is no priority"); *Zehner v. Johnston*, 53 N.E. 1080, 1082 (Ind. App. 1899) (measuring the priority of a mechanic's lien based on "the time when the work for which the lien is claimed was commenced, or to when the first material for which the lien is claimed was furnished").

liens, once recorded, to relate back to an earlier time for priority purposes.").[8]

To support its interpretation, First Bank cites *Robert Neises Construction Corp. v. Grand Innovations, Inc.*, 938 N.E.2d 1231, 1235 (Ind. Ct. App. 2010), which held that a bank's mortgage lien was senior to a later-recorded mechanic's lien even though the work underlying the mechanic's lien predated the bank recording its mortgage lien. The Court of Appeals provided only a paragraph of analysis, stating in conclusory fashion that this statutory construction was required "to avoid an absurd result," but the court did not provide any explanation of what absurd result it was avoiding. *See id.* Of course, courts cannot override the legislature's policy choice based on their own view that a different policy would be better. *See R.R. v. State*, 106 N.E.3d 1037, 1042 (Ind. 2018) (explaining that the absurdity doctrine applies only when a contrary reading "truly is absurd, and not merely unwise or unsound").

The Court of Appeals also did not acknowledge all the prior case law establishing that construction lien priority relates back to when the lienholder began performing labor or furnishing materials or machinery on the encumbered property. First Bank argues that *Neises* pivoted from prior precedent because the legislature tweaked the statutory language after those cases were decided, changing the reference from construction liens "so created" by recording a notice to instead referring to a lien that "is created" when it "is recorded." Br. of Appellant First Bank Richmond at 27–28. But *Neises* did not discuss any change in the statutory language,

---

[8] *See also* 3 *Bruner & O'Connor Construction Law* § 8:177 (2024) ("In many jurisdictions, the mechanics' lien will relate back to an earlier time. A number of states treat the lien as taking priority from the time of 'commencement' or 'visible commencement' of the improvement, provided that the claimant records its lien within the statutorily required time after it completes its work on the project."); *Greene v. Thompson*, 554 So. 2d 376, 379 (Ala. 1989) (holding that a mechanic's lien has priority over any "encumbrances attaching after the commencement of the work."); *Trustees of Mortg. Tr. of Am. v. Dist. Ct. In & For Routt Cnty.*, 621 P.2d 310, 312 (Colo. 1980) (explaining that "the mechanics' lien statutes provide that an effective mechanic's lien relates back in time to the 'commencement of work' upon the construction project at issue, thus gaining a preference over other liens and interests in land which may have been recorded prior to the actual filing of the mechanic's lien").

and when the legislature recodified the statute with the tweaks First Bank notes, the legislature instructed that it was not altering the substance of the law. *See* I.C. § 32-16-1-5 ("[I]f the literal meaning of [the recodification] (including a literal application of an erroneous change to an internal reference) would result in a substantive change in the prior property law, the difference shall be construed as a typographical, spelling, or other clerical error").

We therefore do not find *Neises*'s reasoning persuasive. And to the extent *Neises* held that a construction lien's priority is measured from its recording date rather than from the date when the lienholder began performing labor or furnishing materials or machinery, that holding was mistaken, and we disavow it.

Because Garmong and Fox began providing their improvements before First Bank recorded its mortgage lien, the construction liens generally have priority over the mortgage lien, with one important exception we discuss next.

### B.     First Bank's mortgage lien is senior for the money it loaned to satisfy Garmong's prior lien, but not for the remainder of the loan funds.

Even where a construction lien would otherwise be senior to an earlier recorded mortgage lien, there is a statutory exception for a mortgage lien that secures project financing: "The mortgage of a lender has priority over all liens created under this chapter that are recorded after the date the mortgage was recorded, **to the extent of the funds actually owed to the lender for the specific project to which the lien rights relate**." I.C. § 32-28-3-5(d) (emphasis added); *see also Harold McComb & Son, Inc. v. JPMorgan Chase Bank, NA*, 892 N.E.2d 1255, 1262 (Ind. Ct. App. 2008) (explaining that "our legislature adopted Indiana Code section 32–28–3–5(d) to establish that where the funds from the loan secured by the mortgage are for the project which gave rise to the mechanic's lien the mortgage lien has priority over the mechanic's liens recorded after the mortgage" (cleaned up)).

First Bank loaned EdgeRock $4.9 million, and it is undisputed that the bank recorded its mortgage lien before Garmong and Fox recorded the construction liens in dispute. EdgeRock used $2,140,722.51 of the loan funds to satisfy Garmong's prior construction lien; $2,028,443.62 to pay partners in Oak Ridge Investors; $300,000 for First Bank loan charges; $15,000 for EdgeRock's attorney fees; $9,269 for title charges; $5,000 for an insurance premium; and $165 for recording charges. EdgeRock retained the remaining $401,399.87 for its general use. The $2,028,443.62 EdgeRock paid to Oak Ridge's investors led to the release of the prior mortgage on Lots 4 and 5, allowing EdgeRock to then mortgage the lots as security (along with other security) for First Bank's $4.9 million loan.

The parties and the trial court all agree that the statutory exception for project financing makes First Bank's mortgage lien senior to the construction liens for the $2,140,722.51 that First Bank loaned EdgeRock to pay off Garmong's prior construction lien. That is because the funds to satisfy the prior lien were used "for the specific project to which" the construction lien rights relate. I.C. § 32-28-3-5(d). But the trial court concluded that was the only portion of the mortgage lien that was senior to the construction liens because none of the remaining "loan proceeds went to future development." App. Vol. 2 at 144, ¶ 178.

First Bank argues its entire mortgage lien is senior to the construction liens, and, if not, at least all but the $401,399.87 for EdgeRock's general use should be senior. The bank contends the trial court made a legal error by "inappropriately interpret[ing] the statutory phrase 'for the specific project' to mean only loan proceeds earmarked for construction of improvements, and not loan proceeds to acquire or satisfy preexisting liens against the project's land." Br. of Appellant First Bank Richmond at 21 (citing I.C. § 32-28-3-5(d)). First Bank also worries this will "have a chilling effect on refinance transactions." *Id.*

We read the trial court's order differently. As we read the order, the trial court did not conclude that land acquisition costs or refinancing can never be for the specific project to which construction lien rights relate; it just found that in this case the payment to the partners in Oak Ridge Investors was not for land acquisition or refinancing to support the

project. Instead, the court found that this portion of the loan was simply a mechanism for the investors to retrieve their capital without paying the contractors who had improved the properties composing the project in which the investors had invested.

As the trial court explained, the bank's loan was a "half after-the-fact construction loan for an in-progress project" (the portion for which the parties agree the bank's lien is senior) and "half a mechanism to allow Edgerock to move money from one related LLC to another" for uses that had nothing to do with the project (the portion for which the trial court held the bank's lien is junior). *Id.* at 170–71, ¶¶ 137, 139. And the trial court had many reasons for that finding.

One reason was that the description on the commercial loan application was that the funds were for "non-purchase money collateral." App. Vol. 2 at 141, ¶ 165. Left unchecked were boxes for "construction and permanent loans, revolving draw construction line of credit," and "draw construction loan." *Id.* Also left unchecked was a box where "the loan proceeds will be for the purchase of collateral" along with a description left blank for "purchase-money collateral." *Id.* While EdgeRock used some of the loan funds to satisfy Garmong's prior lien, "none of the [First Bank] loan proceeds were used to fund any construction or development costs associated with Fox's construction of the Project's new public infrastructure, i.e., the relocation of the Anna Kendall Drain and the construction of 175th Street." *Id.* at 142–43, ¶ 173. There was also "no purchase agreement between Oak Ridge Investors and Edgerock for the transfer of Lots 4 and 5." *Id.* at 143. The "Oak Ridge Investors quitclaimed the real estate to Edgerock" with the deed noting that there was no consideration and that it was "a transfer between related LLCs with a common principal for internal company purposes." *Id.* at 143–44, ¶ 176.

Put simply, "[n]one of [the bank's] loan proceeds went to future development," *id.* at 144, ¶ 178, and the "acquisition of Lots 4 and 5 by Edgerock was unnecessary to complete this specific project," *id.* at 171, ¶ 143. "The Bank knew that the lien it was paying off was for work already completed" and that "it was not funding a traditional construction

loan where the bank provides acquisition funding that allows the project to proceed." *Id.* at 144, ¶ 180.

First Bank does not identify any findings that are unsupported by evidence, and these findings support the trial court's conclusion that the loan funds beyond those to pay Garmong's prior lien were not for the specific project related to the lien.[9] The bank itself says that its loan enabled EdgeRock to "reorganize the finances[]" of "the whole development company." Reply Br. of Appellant First Bank Richmond at 36. But the statute covers refinancing only for the project related to the liens.

We therefore affirm the trial court's judgment that the bank's mortgage lien is senior for the $2,140,722.51 of the loan funds EdgeRock used to satisfy Garmong's prior construction lien and junior to the construction liens for the remainder of the loan funds.

### C. The trial court did not clearly err by declining to apply equitable subrogation.

Lastly, First Bank argues that equitable subrogation allows the bank to assume the senior position of the Oak Ridge investors' earlier acquisition mortgage that First Bank paid off. As First Bank sees it, the contractors' construction lien was already junior to the investors' mortgage lien that secured the purchase of Lots 4 and 5 before the contractors began working on the lots, so the contractors are no worse off with First Bank assuming that same senior mortgage priority position. If anything, First Bank argues, the contractors are better off because it was First Bank's loan that enabled EdgeRock to pay Garmong's outstanding invoices.

---

[9] First Bank argues that Signworks is not on equal footing with Garmong and Fox because Signworks performed work only on ZPS's Lots 1 and 2, not EdgeRock's Lots 4 and 5. So Signworks's only claim to an interest in Lots 4 and 5 is through its money judgment against EdgeRock, which the bank argues is junior to its mortgage lien. Signworks does not respond to this argument, which we treat as conceded.

Equitable subrogation is a common-law doctrine for avoiding the "inequitable application of the general principle that priority in time gives a lien priority in right." *Neu v. Gibson*, 928 N.E.2d 556, 560 (Ind. 2010). Under the doctrine, when a payor discharges the entire debt that a debtor held subject to a mortgage, the payor succeeds to the previous mortgagee's rights, including the priority over junior liens, so long as there is no prejudice to the interests of junior lienholders. *Bank of New York v. Nally*, 820 N.E.2d 644, 651, 655 (Ind. 2005). The basis for the doctrine is "the lender's justified expectation of receiving a security interest in the property." *Id.* at 653 (brackets and quotations omitted). Otherwise, junior lienholders would obtain a windfall through promotion in priority. *Id.* "In considering whether to order subrogation and thus bypass the general principle of priority, courts base their decisions on the equities, particularly the avoidance of windfalls and the absence of any prejudice to the interests of junior lienholders." *Neu*, 928 N.E.2d at 560.

As we've previously explained:

> We agree with the *Restatement* at least in the context of a conventional refinancing. A lender providing funds to pay off an existing mortgage expects to receive the same security as the loan being paid off. Refinancings are commonplace in today's economy. Permitting a junior lienholder to leapfrog the priority of the current senior mortgage would impair the owner's access to more favorable interest rates. Unless a junior lienholder is disadvantaged by permitting subrogation, we see no reason to give the junior lienholder in effect the right to block or object to the refinancing. We conclude that a mortgagee who refinances an existing mortgage is entitled to equitable subrogation even if it had actual or constructive knowledge of an existing lien on the property unless the junior lienholder is disadvantaged or the mortgagee is "culpably negligent" . . . but this remedy is subject to the rights and limitations of the subrogor.

*Nally*, 820 N.E.2d at 653–54.

First Bank argues equitable subrogation applies here because it paid off the investors' acquisition mortgage for Lots 4 and 5 expecting to receive the same security—a mortgage on the property with senior priority—as the investor loan that First Bank paid off. And, the bank argues, allowing the contractors to leapfrog the priority of the mortgage security would produce a windfall to them at First Bank's expense. The bank also argues this would put contractors in a position to block a project owner's access to refinancing options on more favorable lending terms.

The trial court found that the equities favored the contractors because the portion of the loan in dispute was not a traditional refinancing but a vehicle for the investors to retrieve their capital without paying the contractors that had improved the properties composing the project in which they had invested. As the court explained, "[t]he Bank knew it was paying off an existing mechanic's lien for an in-trouble project through an unconventional financing arrangement," including that "[t]he Bank knew that it was not making a traditional construction loan or purchase-money loan where it would finance the purchase of the properties and pay additional draws as the construction progressed." App. Vol. 2 at 169–70, ¶ 132. None of the disputed funds were spent on the project, and the loan application noted that the loan was for non-purchase collateral.

"The Bank also knew the transaction between Oak Ridge Investors and Edgerock was not an arm's-length deal," that "Edgerock had an interest in Oak Ridge Investors," and "that Birch Dalton was the manager of both entities." *Id.* at 170, ¶ 133. There was no purchase agreement for transferring Lots 4 and 5 from Oak Ridge to EdgeRock, and the quitclaim deed noted both that the transaction was for "no consideration" and that it was "a transfer between related LLCs with a common principal for internal company purposes." *Id.* at 170, ¶ 134.

First Bank argues the trial court should have balanced the equities differently and concluded that declining to apply equitable subrogation gives the contractors "an unearned windfall" and places them "in a far better position than they would have been without [the bank's] loan." Br. of Appellant First Bank Richmond at 45. Without the loan, the bank

argues, "Garmong would not have received a sizeable payment for its work." *Id.* But there are two problems with this argument.

The first problem is that while it is certainly true that the bank's loan proceeds enabled EdgeRock to pay Garmong's outstanding invoices, the parties agree that the bank's mortgage lien is senior as to those funds. But those funds were less than half the loan. It is the rest of the loan proceeds that are in dispute. And as to those proceeds, there was evidence supporting the trial court's finding that those funds were not for refinancing a construction project but for returning capital to investors, which then avoided paying the contractors for improvements they made to the property in the project in which the investors had invested.

The second problem is that the argument contradicts our standard of review. While the trial court could have weighed the equities as the bank proposes, the court didn't have to. We cannot second-guess the court's judgment because the evidence supports its findings, and its findings support its conclusion.[10]

We therefore affirm the trial court's judgment declining to apply equitable subrogation.[11]

# Conclusion

For these reasons, we affirm in part, reverse in part, and remand for the trial court to amend the judgment consistent with this opinion. That includes amending the judgment to reflect:

---

[10] We summarily affirm the decision of the Court of Appeals reversing the trial court's award to EdgeRock of the Road Impact Fees and instructing the trial court to distribute the funds consistent with the outcome of related litigation in the Hamilton County Commercial Court. *EdgeRock Dev., LLC*, 227 N.E.3d at 936. We also summarily affirm the decision of the Court of Appeals awarding First Bank its attorney fees. *Id.* at 938.

[11] The trial court also concluded, and Garmong and Fox agree, that the legislature's statutory scheme for construction lien priority abrogated the doctrine of equitable subrogation in this context. Because we affirm the trial court's decision not to apply the doctrine, we need not decide whether the lien statute has abrogated the doctrine in this context.

- Garmong's construction liens against EdgeRock's Lots 4 and 5 securing the $943,042.64 debt under the EdgeRock-Garmong contract are invalid, but the related judgment liens against EdgeRock remain valid.

- Garmong's construction liens on ZPS's Lots 1 and 2 securing the debt under the EdgeRock-Garmong contract are valid only for the amount of $520,509.70, and they may be enforced only if the sale of EdgeRock's Lots 4 and 5 does not satisfy the debt.

- Fox's construction liens on EdgeRock's Lots 4 and 5 securing the $202,623.56 debt under the Fox-Garmong subcontract are valid, but Fox's liens for that amount on ZPS's Lots 1 and 2 are not.

- Fox's construction liens on EdgeRock's Lots 4 and 5 securing the $1,166,728.33 owed under the EdgeRock-Fox contract are valid, but Fox's liens on ZPS's Lots 1 and 2 securing that debt are not.

- Signworks's judgment lien on EdgeRock's Lots 4 and 5 is junior to First Bank's mortgage lien on those lots.

In addition, we summarily affirm the holdings of the Court of Appeals: (1) that the trial court did not err in concluding that factual disputes precluded summary judgment on EdgeRock's claim that Change Order #3 was invalid because it was not approved in writing; (2) that the trial court did not err in granting Garmong's summary judgment motion (and denying EdgeRock's competing summary judgment motion) on EdgeRock's claim that it was entitled to a credit for amounts owed under the Garmong contract for work related to the 175th Street Project and the drain relocation; (3) reversing the trial court's award to EdgeRock of the Road Impact Fees and instructing the trial court to distribute the funds consistent with the outcome of related litigation in the Hamilton County Commercial Court; and (4) that First Bank is entitled to recover attorney fees from EdgeRock.

Finally, we affirm the trial court's judgment in all respects not appealed. Also, like the Court of Appeals, we note that our holdings do not disturb the in personam judgments against EdgeRock on Garmong's and Fox's breach-of-contract claims.

Rush, C.J., Massa, Slaughter, and Goff, JJ., concur.

ATTORNEYS FOR APPELLANT EDGEROCK DEVELOPMENT, LLC
Maggie L. Smith
Darren A. Craig
Frost Brown Todd LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLANT ZPS WESTFIELD, LLC
Nathaniel M. Uhl
Jenny R. Buchheit
Adam M. Alexander
Ice Miller LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLANT FIRST BANK RICHMOND
Scott J. Fandre
David M. Johnson
Krieg Devault LLP
Mishawaka, Indiana

Bryan H. Babb
James E. Carlberg
Nathan T. Danielson
Bose McKinney & Evans LLP
Indianapolis Indiana

Ronald L. Cross
Boston Bever Forrest Cross & Sickmann
Richmond, Indiana

ATTORNEYS FOR APPELLEES C.H. GARMONG & SON, INC., AND SIGNWORKS, INC.

Peter S. French

Jeffrey D. Stemerick

Neil R. Peluchette

Taft Stettinius & Hollister LLP

Indianapolis, Indiana

ATTORNEYS FOR APPELLEE FOX CONTRACTORS CORP.

Robert W. Eherenman

Haller Colvin PC

Fort Wayne, Indiana

ATTORNEYS FOR *AMICUS CURIAE* INDIANA BANKERS ASSOCIATION

Thomas W. Dinwiddie

Daniel R. Kelley

Dinsmore & Shohl LLP

Indianapolis, Indiana

ATTORNEYS FOR *AMICI CURIAE* INDIANA CONSTRUCTORS, INC., INDIANA BUILDERS ASSOCIATION, AND ASSOCIATED GENERAL CONTRACTORS OF INDIANA, INC.

Joseph M. Leone

Michael F. Drewry

Sean T. Devenney

Drewry Simmons Vornehm, LLP

Carmel, Indiana